IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

GIORGIO ZAMPIEROLLO-RHEINFELDT,

**Plaintiff,**

v.

INGERSOLL-RAND DE PUERTO RICO,
INC. and/or TRANE PUERTO RICO,
and/or TRANE PUERTO RICO LLC,

**Defendants.**

**CIVIL NO. 15-1255 (RAM)**

<u>**OPINION AND ORDER**</u>

RAÚL M. ARIAS-MARXUACH, District Judge

Pending before the Court is Defendants Ingersoll-Rand de Puerto Rico, Inc. and/or Trane Puerto Rico, and/or Trane Puerto Rico LLC's *Motion for Summary Judgment* ("Motion for Summary Judgment" or "MSJ") alongside a *Statement of Uncontested Material Facts* ("SUMF") and accompanying exhibits. (Docket Nos. 19 and 20). For the reasons set below, having considered the parties' submissions and in opposition and support of the same, the Court **GRANTS** Defendants' *Motion for Summary Judgment* (Docket No. 19).

### I.   PROCEDURAL BACKGROUND

On March 18, 2015, Plaintiff Giorgio Zampierollo-Rheinfeldt ("Zampierollo" or "Plaintiff") sued Ingersoll-Rand Puerto Rico, Inc. and/or Trane Puerto Rico, and/or Trane Puerto Rico LLC (collectively, "Defendants") seeking monetary damages and declaratory relief under the Age Discrimination in Employment Act

("ADEA"), 29 U.S.C. 621 *et seq.* and under Puerto Rico Law 100, 29 P.R. Laws Ann. tit §146 *et seq.* ("Law 100") and Law 80, 29 P.R. Laws Ann. tit §146 *et seq.* ("Law 80"). (Docket No. 1 at 7-9). Generally, Zampierollo averred he was wrongfully discharged because of his age and his duties were instead assigned to two (2) younger employees. Id. at 7 ¶¶ 44-45.

On January 8, 2016, Defendants filed their MSJ alongside an SUMF. (Docket Nos. 19 and 20). Plaintiff then filed an opposition to the MSJ (Docket No. 30) and an opposition to Defendants' SUMF accompanied by additional uncontested facts ("Opposition to SUMF"). (Docket No. 31).[1] Lastly, Defendants replied to Zampierollo's *Opposition to SUMF* ("Response") (Docket No. 37) and *Opposition* ("Reply"). (Docket No. 39). The Court will herein address the pending MSJ and parties' responses and oppositions.

## II.   LEGAL STANDARD

A motion for summary judgment is governed by Fed. R. Civ. P. 56(a). Summary judgment is proper if "the movant shows [...] no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if the evidence "is such that a reasonable jury could resolve the point in the [non-movant's] favor." Mercado-Reyes v. City of Angels, Inc., 320 F. Supp. 3d 344, 347 (D.P.R.

---

[1] On February 21st, 2020, this Court **GRANTED** Plaintiff's *Motion in Limine* at Docket No. 63, striking from the record Exhibits 5 and 10 of Plaintiff's *Opposition to SUMF* at Docket No. 31. (Docket No. 63).

2018) (quotation omitted). A fact is material if "it is relevant to the resolution of a controlling legal issue raised by the motion for summary judgment." Bautista Cayman Asset Co. v. Terra II MC & P, Inc., 2020 WL 118592, at *6 (D.P.R. 2020) (quotation omitted).

The moving party has "the initial burden of demonstrat[ing] the absence of a genuine issue of material fact with definite and competent evidence." Mercado-Reyes, 320 F. Supp. 34 at 347 (quotation omitted). The burden then shifts to the nonmovant, to present "competent evidence to rebut the motion." Bautista Cayman Asset Co., 2020 WL 118592, at 6* (quoting Méndez-Laboy v. Abbott Lab., 424 F.3d 35, 37 (1st Cir. 2005). A nonmoving party must show "that a trialworthy issue persists." Paul v. Murphy, 2020 WL 401129, at *3 (1st Cir. 2020) (quotation omitted).

While a court will draw all reasonable inferences in favor of the non-movant, it will disregard conclusory allegations, unsupported speculation and improbable inferences. See Johnson v. Duxbury, Massachusetts, 931 F.3d 102, 105 (1st Cir. 2019). Moreover, the existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." Scott v. Harris, 550 U.S. 372, 379 (2007) (quotation omitted). Hence, a court should review the record in its entirety and refrain from making credibility determinations or weighing the evidence. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000).

Finally, Local Rule 56 also governs summary judgment. *See* D.P.R. Civ. R. 56. Per this Rule, a nonmoving party must "admit, deny or qualify the facts supporting the [summary judgment] motion [...] by reference to each numbered paragraph of the moving party's statement of material facts." Id. The First Circuit has highlighted that "[p]roperly supported facts [...] shall be deemed admitted unless controverted in the manner prescribed by the local rule." Advanced Flexible Circuits, Inc. v. GE Sensing & Inspection Techs. GmbH, 781 F.3d 510, 520 (1st Cir. 2015) (quotation omitted).

### III. FINDINGS OF FACT

After analyzing Defendants' SUMF (Docket No. 20) and Plaintiff's *Additional Statements of Uncontested Facts* ("ASUF") (Docket No. 31), and then **only crediting material facts** that are **properly supported by a record citation and uncontroverted**, the Court makes the following findings of facts:

1. Plaintiff was born on April 1, 1958. (Docket No. 20 ¶ 1).

2. Plaintiff began his employment with Trane in 1980 as a Sales Engineer. (Id. ¶ 2).

3. Plaintiff received three (3) promotions throughout his career with Trane. In 2000, he was promoted to District General Manager for Puerto Rico. (Id. ¶ 3).

4. Plaintiff was over forty (40) years old when he was promoted to District General Manager. (Id. ¶ 4).

5. As District General Manager, Plaintiff was accountable for the operation of the Puerto Rico office. (Id. ¶ 5).

6. He was responsible for the management and leadership of the same consisting of Parts, Equipment, Service and

Contracting in Trane Puerto Rico, Inc; he was a key member in developing and executing Trane's strategy of establishing island wide distribution channels and gaining influence with decision-makers and was responsible for overall performance of island wide operations. (Docket No. 31 ¶ 3).

7.  All sales channels, dealer channels and Direct and Indirect Sales Channels, along with the Logistic Manager and Marketing reported directly or indirectly to Plaintiff as District General Manager. The sales channels reported indirectly to Plaintiff through Mr. Juan Carlos Teruel ("Teruel"). (<u>Id.</u> ¶ 4).

8.  Safety, Controls, Contracting, Service, and Project Administration reported directly or indirectly to Plaintiff. Controls, Contracting and Services reported indirectly through Luis Andrés, Operations Manager. (<u>Id.</u> ¶ 5).

9.  Plaintiff had the highest salary in the office and Luis Andrés had the second highest salary. (<u>Id.</u> ¶ 6).

10. Between 2012 and 2013, Plaintiff estimates that Trane's Puerto Rico office had approximately one hundred (100) employees. (Docket No. 20 ¶ 6).

11. Of those employees, Plaintiff estimates that about one third (1/3) were over forty (40) years old. (<u>Id.</u> ¶ 7).

12. Plaintiff had six (6) managers who reported directly to him, of which four (4) were over forty (40). (<u>Id.</u> ¶ 8).

13. Around 2012, Defendants' President, William Sekkel, who was older than Plaintiff at the time he retired, retired from Trane. (<u>Id.</u> ¶ 13-14).

14. Ms. María Blasé ("Blasé") was then announced as President. (<u>Id.</u> ¶ 13).

15. Ms. Blasé visited the Puerto Rico office in September of 2012. (<u>Id.</u> ¶ 15).

16. During that visit, Plaintiff met with Ms. Blasé, and they discussed the business of the Puerto Rico office. (<u>Id.</u> ¶ 16).

17. According to Plaintiff, Ms. Blasé was "very emphatic" about reducing the Sales, General, and Administrative (SG&A") expenses of the company. (Id. ¶ 17).

18. Plaintiff presented his yearly plan for the office for 2013 to Ms. Blasé, which included a negative outlook for growth in Puerto Rico, and reflected that the office was not on target to meet its numbers for 2013. (Id. ¶ 18).

19. Ms. Blasé told Plaintiff that the organization had to look to reduce its expenses. (Id. ¶ 19).

20. She requested that Plaintiff reduce the projected SG&A for the 2013 yearly plan. (Id. ¶ 20).

21. Around May 2013, Plaintiff began to report to Mr. Enrique Flefel ("Flefel"), who was promoted from Business Leader of Trane's Chile office to Vice President of North Latin America, which included Puerto Rico. (Id. ¶¶ 11 and 23).

22. Plaintiff did not suffer any change to his terms, duties, compensation or other employment benefits once Mr. Flefel became his supervisor. (Id. ¶ 25).

23. When Mr. Flefel took over the North Latin America region, the Puerto Rico office which had seen a significant reduction in sales compared to the previous year and had one of the highest SG&A expenses of the region. (Id. ¶ 27).

24. The SG&A for the Puerto Rico Office in 2012 was $5,914,000.00, around 17.4% of the office's revenue. (Id. ¶ 28).

25. The SG&A for 2013 was budgeted to be $5,833,000.00, around $16.7% of the year's gross income. (Id. ¶ 29).

26. Around June 2013, Mr. Flefel expressed concern to Plaintiff and Ms. Brenda Fuentes ("Fuentes"), the Puerto Rico Finance Director, and inquired as to how to ensure the office reached its targets. (Id. ¶ 31).

27. According to Ms. Fuentes, the Puerto Rico office was not meeting its targets with regards to Operating Income ("OI"), costs, the gross margin or SG&A. (Id. ¶ 33).

28. Given Puerto Rico's economic situation, Mr. Flefel

understood that increasing revenue was not an option to stabilize the Puerto Rico office, so instead he focused on reduction of costs. (Id. ¶ 34).

29. Mr. Flefel worked with the Puerto Rico office management to identify where the office could reduce expenses, such as renegotiating the lease or sub-leasing office space, lowering benefit costs, and cutting the marketing budget. (Id. ¶ 35).

30. Since around late June 2013, Plaintiff was aware that a reduction in labor costs might be necessary as a result of low sales and high SG&A. (Id. ¶ 37).

31. Approximately sixty-five percent (65%) of the office's expenses were salaries and benefits. (Id. ¶ 39).

32. The largest expenses in the Puerto Rico office were always payroll and the rent, but nothing could be done about the rent. (Docket No. 31 ¶ 26).

33. Mr. Flefel began considering a new organizational structure for the Puerto Rico office around July 2013. (Docket No. 20 ¶ 40).

34. During summer 2013, there were several visits from Regional Human Resources personnel, including Ms. Susan Cosmai ("Cosmai"), Human Resources Lead for North Latin America. (Id. ¶ 43).

35. Mr. Flefel and Ms. Cosmai requested Ms. Sandra Angueira ("Angueira"), local Human Resources Manager, to provide individual feedback regarding each of the managers at the Puerto Rico office, which she gave in meetings and during phone calls. (Id. ¶ 44,59).

36. Mr. Flefel decided on a new organizational structure in the Puerto Rico office as part of an effort to increase productivity, reduce the SG&A and run the Puerto Rico office efficiently. (Id. ¶ 45).

37. Because Plaintiff did not meet the reductions that Mr. Flefel was requesting from him, Mr. Flefel decided to implement a new organization for the Puerto Rico office (Docket No. 31 ¶ 12).

38. The organizational structure he decided to implement was

the same structure that was in place at Defendants' Chile office when he was Business Director, as well as other subsidiaries similar in size and revenue as the Puerto Rico office. (Docket No. 20 ¶ 46).

39. The idea behind this organizational structure was to have one person, the Business Leader, dedicated to business and revenue (sales); and another, the Operations Leader, dedicated to fulfillment and operation of the office, to make use of the market opportunities available to Trane in Puerto Rico and improve productivity. (Id. ¶ 47).

40. When Mr. Flefel worked at the Chile office, this model was successful and he believed it was a good solution for the Puerto Rico office to reach its targets. (Id. ¶ 48).

41. The new design for the Puerto Rico office did not require the position of District Manager. (Id. ¶ 50).

42. The new structure of the Puerto Rico office also entailed the elimination of the Operations Manager, a Construction Project Manager position, and an Administrative Assistant position. (Id. ¶ 51).

43. It was Mr. Flefel's decision to implement the new structure for the Puerto Rico office, and he presented this plan to Ms. Cosmai and Ms. Blasé, who gave the final approval for the restructuring plan. (Id. ¶ 52).

44. Ms. Cosmai was in charge of drafting the Project Plan and the process for implementing the restructuring of the Puerto Rico office. (Id. ¶ 55).

45. In August 2013, Ms. Cosmai prepared a docket for the Finance Department, which reflected the costs of the restructuring process and anticipated savings. (Id. ¶ 56).[2]

46. The management of the Puerto Rico office was not involved in the decision to restructure. (Id. ¶ 58).

47. Around late July or August 2013, after the decision to restructure had been made, Ms. Cosmai informed Ms.

---

[2] The word "docket" does not solely refer to a record of legal proceedings but is also defined as "a brief written summary of a document: abstract." Docket, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/docket (last visited Feb. 21, 2020).

Angueira that a new structure would be implemented, and certain positions would be eliminated, but was not given any further details. (Id. ¶ 59).

48. In August 2013, Ms. Cosmai requested Ms. Angueira to prepare a working organizational chart to assist Mr. Flefel and herself in connection with the restructure, which identified, among other things, the positions that were going to be eliminated, positions that required replacements, and individuals who could be terminated due to low performance. (Id. ¶ 60).

49. Around September 2013, Mr. Flefel asked Ms. Angueira for her feedback as to who she thought could carry out particular duties if certain persons were no longer with the company as a result of the restructuring. (Id. ¶ 61).

50. Ms. Angueira suggested that Mr. Flefel review the Organizational Leadership Review ("OLR") and Talent Review for the Puerto Rico office. (Id. ¶ 62).

51. The OLR and Talent Review were prepared by Mr. Zampierollo. (Id. ¶ 63).

52. Mr. Flefel selected Mr. Sergio Sanjenis ("Sanjenis") and Mr. Teruel for the Business Director and Services Operations Leader positions, respectively, based on his evaluation of their individual strengths, the feedback of Ms. Angueira, and the OLRs for 2012 and 2013 which consistently showed these two (2) candidates as being the top talent of the Puerto Rico office. (Id. ¶ 65).

53. Four (4) employees were terminated as a result of the restructuring. (Id. ¶ 68).

54. Of the four (4) employees terminated on September 23rd, 2013 three (3) were over fifty (50) years old, Luis Andrés, Luis Dávila and Plaintiff, and one in her twenties (20's), Verónica Fernández. (Docket No. 31 ¶ 16).

55. Their duties were distributed among the remaining employees. (Docket No. 20 ¶ 69).

56. Mr. Flefel informed Plaintiff of his termination during a meeting on September 23, 2013, the week before the termination was to be effective. (Id. ¶ 70).

57. The reason for Plaintiff's termination was restructuring and cost reduction. (Id. ¶ 71).

58. Mr. Flefel then met with Mr. Sanjenis and Mr. Teruel to discuss their proposed new roles. (Id. ¶ 72).

59. The organizational changes were informed to the employees of the Puerto Rico office by Mr. Flefel in a meeting on September 30, 2013. An organizational announcement regarding the restructuring was also issued. (Id. ¶ 75).

60. The meeting lasted approximately an hour, during which Mr. Flefel informed that a new structure would be implemented because the office was not meeting the numbers and cost-reduction was necessary, and that he needed everyone engaged and ready to work out the rest of the year. (Id. ¶ 76).

61. Mr. Sanjenis and Mr. Teruel absorbed Plaintiff's duties, in addition to other duties and responsibilities that were assigned to them. (Id. ¶ 78).

62. Prior to the restructuring, Mr. Sanjenis was responsible for the Dealer Channel, Logistics, Marketing, and Advertising. (Id. ¶ 79).

63. After the restructuring, Mr. Sanjenis continued to be responsible for those duties, and also assumed full responsibility for Sales, which includes the direct and indirect commercial sales channel. (Id. ¶ 80).

64. Prior to the restructuring, Mr. Teruel was responsible for the Direct and Indirect Commercial Sales channel. (Id. ¶ 81).

65. After the restructuring, Mr. Teruel assumed a new, expanded role, which consolidated functions assigned to the District General Manager as well as duties carried out by the Operations Manager, in which he was responsible for the entire fulfillment side of the Puerto Rico office, which included Controls, Contracting, Service, Service Maintenance, Service Repair, Project Administrators, and Safety. (Id. ¶ 82).

66. Defendants implemented a new sales structure, with a new Parts channel, Dealer channel, and Direct and Indirect

Sales channel which all report to Mr. Sanjenis, along with a Logistics Manager and a Marketing Specialist. (<u>Id.</u> ¶ 84).

67. Defendants also consolidated the reporting of Safety, Controls, Contracting, Services, and Project Administration under Mr. Teruel. (<u>Id.</u> ¶ 85).

68. Mr. Sanjenis is ten (10) years younger than Plaintiff. (<u>Id.</u> ¶ 19).

69. Mr. Teruel is sixteen (16) years younger than Plaintiff. (<u>Id.</u> ¶ 20).

70. During the transition period, Mr. Flefel assumed a more active role with the Puerto Rico office, to ensure that the new structure was implemented properly, and to support Mr. Sanjenis and Mr. Teruel as they adjusted to their new roles. Mr. Flefel visited the Puerto Rico office two (2) times in the fourth quarter of 2013, and six (6) times during 2014. (Docket No. 20 ¶ 86).

71. Mr. Flefel took on some of the duties that had previously been assigned to the position of District General Manager. He took the lead of the preparation of the 2014 Annual Operation Plan ("AOP"), the Puerto Rico Structure, Talent Development, Organizational Leadership Reviews, among others. (<u>Id.</u> ¶ 87).

72. Such duties are now performed by Mr. Sanjenis and Mr. Teruel, with the collaboration of Mr. Flefel. (<u>Id.</u> ¶ 88).

73. As of the date of the restructuring, October 1, 2013, forty-five (45) of Trane's ninety-five (95) employees in Puerto Rico were over forty (40) years of age, and thirteen (13) were over fifty (50) years old. Of the eleven (11) managers that worked there as of October 1, 2013, only two (2) were under the age of forty (40). (<u>Id.</u> ¶ 92).

74. The two (2) Project Managers who were not terminated are the same age or older than Plaintiff. (<u>Id.</u> ¶ 93).

75. The restructuring resulted in a significant reduction of the total SG&A the following year, from $5,309,000.00 to $4,673,000.00. (<u>Id.</u> ¶ 94).

76. The total salaries and benefits paid by the Puerto Rico office were also reduced from $3,245,059.00 in 2013 to $2,415,077.00 in 2014. (Id. ¶ 95).

77. Plaintiff was the only employee in his occupational classification. (Id. ¶ 96).

78. As of today, the position of District General Manager does not exist at the Puerto Rico office. No one was hired or reassigned to that position. (Id. ¶ 97).

79. Defendants do not have a policy which requires to reassign employees whose positions have been eliminated within the Company. (Id. ¶ 98).

80. Defendants hired two (2) managers in the year 2014 – a Logistics Manager and a Parts Manager. (Id. ¶ 99).

81. Both managers were over the age of fifty (50) at the time they were hired. (Id. ¶ 100).

82. On December 31, 2014, the Equal Employment Opportunity Commission closed its file on Plaintiff's charge of age discrimination on the grounds that it could not conclude that a violation of the ADEA occurred. (Id. ¶ 103).

83. Plaintiff cannot recall the specific words used by Mr. Flefel to state the reasons for his termination. (Id. ¶ 109).

84. Plaintiff has no knowledge of Defendants' reasoning for eliminating his position. (Id. ¶ 110).

85. Plaintiff has no personal knowledge of the criteria employed in selecting which positions would be eliminated. (Id. ¶ 111).

86. Plaintiff has no personal knowledge of Defendants' reasons for restructuring their operations and/or making personnel and staffing decisions in Brazil, Argentina, or other jurisdictions. (Id. ¶ 113).

87. Plaintiff has no personal knowledge as to the scope of Mr. Sanjenis and Mr. Teruel's positions, or whether they have additional duties aside from those they absorbed once his position was eliminated. (Id. ¶ 114).

88. Plaintiff's claim of age discrimination is based on his own opinion that he was more competent than other employees who were retained. (<u>Id.</u> ¶ 115).

89. Plaintiff simply assumes that age must have been the reason for his termination. (<u>Id.</u> ¶ 116).

90. Plaintiff never complained of age discrimination within Defendants' organization. (<u>Id.</u> ¶ 117).

91. Plaintiff did not request to be considered for another position or a lateral move within Defendants' organization. (Docket No. 20 ¶ 118).

92. Plaintiff was not offered any other alternative to avoid his termination, not even if it entailed a reduction in salary. (Docket No. 31 ¶ 15).

## IV.  ANALYSIS

### A. The Age Discrimination in Employment Act

Mr. Zampierollo sued Defendants for alleged violations to ADEA, Puerto Rico Law 100 and Law 80 for wrongful and age-based discriminatory discharge. (Docket No. 1). Generally, ADEA makes it unlawful for an employee to be discharged because of their age. *See* 29 U.S.C.A. § 623(a) ("It shall be unlawful for an employer […] to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."). To succeed in an ADEA claim, a moving party must prove that age was the "but-for" cause of their employer's adverse action against them. Hence, they must prove through preponderance of the evidence that age "must have been **the determinative factor as opposed to merely a motivating factor in**

**the employer's decision**." Rivera-Cruz v. Hewitt Assocs. Caribe, Inc., 2018 WL 1704473, at *6 (D.P.R. 2018) (citation omitted).

When an employee lacks direct evidence of his employer's discriminatory treatment, the Court may assess circumstantial evidence through the three-step McDonnell Douglas burden-shifting framework. *See* Flaherty v. Entergy Nuclear Operations, Inc., 946 F.3d 41, 53 (1st Cir. 2019) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973)). In the first step, the plaintiff must establish all four prongs of a *prima facie* discrimination case. *See* Rodriguez-Cruz v. Stewart Title Puerto Rico, Inc., 209 F. Supp. 3d 427, 438-39 (D.P.R. 2016). These prongs are:

> (1) that [plaintiff] was at least forty [40] years old at the time of the alleged adverse employment action; (2) [plaintiff] was qualified for the position [he] held; (3) [plaintiff] suffered an adverse employment action; and (4) the employer later filled the position, thereby demonstrating the continuing need for those services.

Id. (citation omitted).

In reduction in force ("RIF") cases such as this one, the fourth prong of the *prima facia* case changes slightly. This occurs because the reduction "seeks to reduce the overall size of the employer's workforce and may not involve the hiring of replacements." Id. at 441. Therefore, "when financial circumstances require a company to terminate a specified percentage of its employees, 'qualified' personnel will

necessarily be discharged." <u>Brown v. Manufacturers Hanover Tr.</u> <u>Co.</u>, 1993 WL 138823, at *4 (S.D.N.Y. 1993). "An employer need not dismiss any particular number of employees or terminate a set percentage of the work force, to institute a reduction in force." <u>Cahue v. De Espana</u>, 1995 WL 510062, at *7 (D.P.R. 1995), <u>aff'd sub</u> <u>nom.</u> <u>Pages-Cahue v. Iberia Lineas Aereas de Espana</u>, 82 F.3d 533 (1st Cir. 1996) (quotation omitted). Plaintiff may prove the fourth prong by showing that his employer "either did not treat age neutrally or retained younger employees in the same position." <u>Otero v. Penney</u>, 2015 WL 274171, at *4 (D.P.R. 2015) (quotation omitted).

Once the plaintiff establishes a *prima facie* case of discrimination, a presumption of discrimination arises. The burden then shifts to the defendant to rebut that presumption. To do so, they must "articulate a legitimate, nondiscriminatory basis for dismissing the employee." <u>Santana-Vargas v. Banco Santander Puerto</u> <u>Rico</u>, 2020 WL 415139, at *1 (1st Cir. 2020) (quotation omitted). If the defendant produces a legitimate basis, then the inference of discrimination raised by the *prima facie* case disappears and the final shift of the burden of production occurs.

In this final step, a plaintiff bears the burden of showing that the rational provided by the employer was solely "a pretext for impermissible age discrimination." <u>Martinez v. Nordisk</u>, 397 F. Supp. 3d 207, 219 (D.P.R. 2019) (quotation omitted). To show this,

the plaintiff must "elucidate specific facts which would enable a jury to find that the reason given is not only a sham, **but a sham intended to cover up the employer's real motive: age discrimination.**" Id. (quoting Meléndez v. Autogermana, Inc., 622 F.3d 46, 52 (1st Cir. 2010)). These specific facts can include inconsistencies, contradictions, weaknesses or incoherencies in the employer's reason sufficient to show that the employer failed to act in a non-discriminatory way. See Reyes Caballero v. Oriental Bank, 2019 WL 6330812, at *11 (D.P.R. 2019) (quotation omitted). It's worth noting that said "pretext analysis is more demanding than the *prima facie* standard." Id.

Lastly, the mere fact that the McDonnell Douglas presumption may shift the burden of production to defendant, does not mean that a plaintiff loses their burden of proof. Rather, the plaintiff maintains this duty throughout the life of the case. See Otero, 2015 WL 274171, at *3-4 (quotation and quotation marks omitted) ("**The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff**.")

Here, Defendants do not dispute that Plaintiff meets the first three prongs of the *prima face* discrimination case. They concede that: (1) Plaintiff was fifty-five years old, and thus over forty (40), when he was terminated; (2) he was qualified for the position he held at Trane's Puerto Rico office; and (3) he suffered an

adverse employment action when he was terminated from his job as
District General Manager at Trane. (Docket No. 19 at 14).
Defendants instead aver that Plaintiff cannot meet the fourth
prong, which requires him to prove that Defendants either failed
to treat age neutrally or that they replaced him with a younger
employee. Id.

Plaintiff was not replaced by a younger employee. Instead,
Zampierollo's position as District General Manager was eliminated
altogether as the new structure at Trane's Puerto Rico office did
not require it. (Docket Nos. 19 at 15 and 20 ¶ 50). Furthermore,
the new structure also eliminated the positions of Operations
Manager, Construction Project Manager, and an Administrative
Assistant. Id. ¶ 51. The District General Manager functions that
had been performed by Plaintiff were redistributed amongst
remaining employees. Id. ¶69. Specifically, Mr. Sanjenis and Mr.
Teruel, absorbed Plaintiff's duties in addition to other duties
and responsibilities that were assigned to them as part of their
new roles as Business Director and Services Operations Leader,
respectively. Id. ¶¶ 65, 78. Both employees were selected for their
positions because of Ms. Angueria's feedback, their individual
evaluations and the fact that 2012 and 2013 OLR's had identified
them as the top talent at Trane's Puerto Rico office. Id. ¶ 65. At
the time of Zampierollo's termination, Mr. Sanjenis was around
forty-five (45) years old and Mr. Teruel was around thirty-nine

(39). (Docket No. 31 ¶¶ 19-20). Defendants hired a Logistics Manager and a Parts Manager in 2014. (Docket No. 20 ¶ 99). However, the record does not reflect that either of them was hired to replace or perform Mr. Zampierollo's duties. Furthermore, these last two Managers were both over fifty (50) years old when hired by Trane. Id. ¶ 100.

Mr. Zampierollo posits that "there was no actual elimination of the position, since all the duties continued existing, [and that the] […] termination of plaintiff [was] guised as an 'elimination' of a position." (Docket No. 30 at 11). As stated above, however, in RIF cases such as the one here, the fourth prong changes somewhat. While Mr. Sanjenis and Mr. Teruel's assumption of Mr. Zampierollo's duties might seem to meet the fourth prong, the First Circuit has stressed that a discharged employee is <u>not</u> "replaced" when another employee takes over the previous one's responsibilities. In particular, it has reiterated that **"[a] discharged employee is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties."** <u>Ramos-Santiago v. WHM Carib, LLC</u>, 919 F.3d 66, 75 (1st Cir. 2019) (quoting <u>LeBlanc v. Great An. Ins. Co.</u>, 6 F. 3d 836, 846 (1st Cir. 1993)). The District of Puerto Rico has further held that an employee is considered "replaced" **only** when an employee is hired or reassigned to <u>exclusively</u> perform plaintiff's duties. This occurred for example in <u>Hoffman-Garcia v. Metrohealth, Inc.</u>,

which determined that "to reasonably infer that Hoffman was replaced by Martínez to the point of having been effectively retained while Hoffman was not, the record would have to show that Hoffman's duties, **"and no others,"** were allocated to Martínez." Hoffman-Garcia v. Metrohealth, Inc., 2018 WL 671200, at *8 (D.P.R. 2018), aff'd, 918 F.3d 227 (1st Cir. 2019)(quotation omitted); *see also* Pages-Cahue, 82 F.3d at 539 ("[To] infer that Pages was replaced by a younger employee, we would have to conclude that Pages' duties, **and no others**, were allocated to Alós, and that Alós should be considered an Iberia employee.")

The fact that Mr. Sanjenis and Mr. Teruel, each assumed **some** of Mr. Zampierollo's duties does not suffice to show age discrimination because they retained other functions. *See e.g.*, Rodriguez-Cruz, 209 F. Supp. 3d at 441–42 (holding that Plaintiff's termination was not discriminatory since her position was eliminated and two older employees in similar roles to hers were retained but under new roles); Soto v. Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints, 73 F. Supp. 2d 116, 127 (D.P.R. 1999) (holding that the fact that some of plaintiff's duties were assumed by another employee in addition to their other duties was insufficient to show that the plaintiff was replaced after his termination).[3]

---

[3] The Court also notes, as Defendants emphasized in their *Reply*, that Mr. Sanjenis was over forty (40) years old when he became Business Director at

Plaintiff also contends that Mr. Sanjenis and Mr. Teruel "happened to be substantially less experienced than [him]." (Docket No. 30 at 11). In his September 24, 2015 Deposition ("the Deposition"), he also implies that he was a more competent employee as he could have fulfilled either position. (Docket No. 20-1 at 44, l. 10-11, 19-23). He explains that "[e]ither of those positions I could have done them, and I could have done them better than any of them. [...] The only difference [...] I'm much (sic) knowledgeable than both of them, with all they've done. The only difference is I'm ten years older than either one or more." Id.

However, this is insufficient to show a discriminatory animus. The First Circuit and the District of Puerto Rico have consistently held as such. For example, in Santana Vargas v. Santander Financial Services, Inc., the District of Puerto Rico stated that "mere questions regarding the employer's business judgment [related to the selection of which employees to retain] are insufficient to raise a triable issue as to pretext." Santana Vargas, 2018 WL 9616878, at *13 (quotation omitted); see also Webber v. Int'l Paper Co., 417 F.3d 229, 238 (1st Cir. 2005) ("an employee's opinion of the efficacy of an employment decision, standing alone, cannot supplant the employer's business judgment.") Other Circuit Courts of Appeals, such as the Second

---

Trane. (Docket No. 39 at 14). Thus, he too was part of the protected class under ADEA at the time of his promotion to the last position he held at Trane.

Circuit in <u>Martinez v. New York City Transit Authority</u> have also repeated this stance. In <u>Martinez</u>, the Second Circuit stated "Plaintiffs argue that there must have been age discrimination because they had been successful employees at the Transit Authorities. **But even successful employees may be terminated in an RIF.**" <u>Martinez v. New York City Transit Authority</u>, 672 F. App'x 68, 70-71 (2d Cir. 2016).

Here, it is also uncontroverted that Plaintiff has no personal knowledge as to the scope of Mr. Sanjenis and Mr. Teruel's positions, or whether they have additional duties aside from those they absorbed once his position was eliminated. (Docket No. 20 ¶ 114; admitted by Plaintiff at Docket No. 31 at 1). The District of Puerto Rico previously held that a lack of knowledge regarding a replacement's duties failed to show a continued need for the same services and skills provided by plaintiff. In <u>Otero v. Penney</u>, the District Court of Puerto Rico posited that "Plaintiff has provided no evidence whatsoever that her replacement was instructed to perform most of her duties[.] […] It follows that Plaintiff has failed to show a continued need for the same services and skills that she had been rendering." <u>Otero</u>, 2015 WL 274171, at *5. In <u>Otero</u>, the Court further concluded that "[t]here being no evidence pointing to the functional similarities in her replacement's duties, Plaintiff's claim amounts to 'conclusory allegations, improbable inferences, and unsupported speculation.'" <u>Id.</u>

(quotation omitted). Lastly, it is also uncontroverted that Mr. Zampierollo lacks personal knowledge as to the criteria used by Trane in selecting which positions to eliminate. Plaintiff clearly admitted as much in his deposition.[4]

The only remaining way for Plaintiff to establish the fourth prong of the *prima facie* case would be to show that Defendants' actions were not age-neutral. Here, too, the facts are not in Plaintiff's favor. The September 2013 RIF was age-neutral facially and as applied. The Court notes that of the four (4) terminated employees, three (3) were over fifty years old: Luis Andrés, Luis Dávila and Plaintiff. (Docket No. 31 ¶ 16). The fourth employee, Verónica Fernández, was in her twenties. Id. The Court is mindful that the mere fact that two of the other terminated employees were also in the protected age group **should not** be interpreted to mean that Defendants had an ageist and discriminatory animus. *See* Rodriguez-Cruz, 209 F. Supp. 3d at 442 ("Plaintiff (age fifty-six)

---

[4]  The pertinent part of the Deposition transcript reads as follows:

Q. But, my question is, Mr. Zampierollo, with regards to this particular reduction in force, the one that resulted in your termination, do you have any personal knowledge as to the criteria that was employed by the company in selecting the positions to be eliminated?

A. Only the document you . . . that was prepared.

Q. **So, you have firsthand knowledge?**

A. **Oh, no, I wasn't part of the decision force there.**

Docket Nos. 20-1 at 41, l. 21-25, 39 at 6, 40-1 at 1, l. 1-3.

and Ms. Figueroa (age forty-five) were terminated, while Ms. Rodriguez (age fifty-six) and Mr. Rodriguez (age fifty) were assigned to new roles. Viewing the evidence in the light most favorable to Plaintiff, the October 2013 RIF was both neutral [facially] […] and as applied to Plaintiff."); *see also*, <u>Moore v. Hertz Equip. Rental Corp.</u>, 296 F. Supp. 2d 1044, 1048 (D. Neb. 2003) ("[T]he four employees terminated in Omaha were 61, 59, 27, and 22 [years old]. […] Hertz [also] terminated a 27-year-old sales coordinator. […] [T]he court is unable to find any proffered evidence showing the decisions […] [were] based on age.")

Most notably, here, there was a higher percentage of employees in the protected age group **after** the RIF than before the same. Before the RIF, the uncontroverted fact is that about one-third (1/3) of the roughly one-hundred Trane Puerto Rico office employees were over forty (40) years old. (Docket No. 20 ¶¶ 6-7, admitted by Plaintiff at Docket No. 31 at 1). Further, four (4) of Plaintiff's six (6) managers who reported directly to him were over the age of forty (40). <u>Id.</u> ¶ 8. After the RIF, forty-five (45) of Trane's ninety-five (95) employees in Puerto Rico were over forty (40) years of age, that is roughly forty-seven percent (47%), and thirteen (13) employees were over fifty (50) years old. <u>Id.</u> ¶ 92. Said fact was also admitted by Plaintiff. (Docket No. 31 at 1). After the RIF of the eleven (11) managers that worked at Trane's Puerto Rico office, only two (2) were under the age of forty (40).

This means that roughly eighty-two percent (82%) of the Puerto Rico office managers were part of the protected age group. Id. Thus, Plaintiff fails to show how Defendants' RIF was not age-neutral. *See* Martinez, 672 F. App'x at 70 ("The RIF's lack of disparate impact on older employees strongly suggests that age was not a factor in Plaintiffs' termination."); *see also*, Marshall v. Hills Bros., 432 F. Supp. 1320, 1324-25 (N.D. Cal. 1977) (holding that after a five-year reorganization, 58.68% of Hills Brothers' exempt employees were between the ages of 40 and 65, compared to 54.22% before the reorganization. Plaintiff could not expect the Court to look at the 9 terminated employees (out of a total of 341 terminations) and conclude that they were terminated due to their age.) In Rodriguez-Cruz v. Stewart Title Puerto Rico, Inc., the District of Puerto Rico determined that defendants did not use age when determining who to terminate as part of the RIF after noting that before the RIF, sixty-one percent (61%) of the defendant's employees were over the age of forty (40) whereas after the RIF sixty-four percent (64%) were over forty. Rodriguez-Cruz, 209 F. Supp. 3d at 442.

Instead, Defendants showed that the reorganization of the Puerto Rico Trane office was strictly business. Id. ¶¶ 38, 59. Typically, "when a company exercises its business judgment in deciding to reduce its work force, 'it need not provide evidence of financial distress to make it a 'legitimate'

RIF.'" <u>Rahlf v. Mo-Tech Corp.</u>, 642 F.3d 633, 639 (8th Cir. 2011) (quotation omitted)). However, Defendants provided evidence, which Plaintiff either admitted or failed to properly controvert, that showed that a reduction in costs through restructuring (including labor costs) was necessary to stabilize the Puerto Rico office. (Docket No. 20 at ¶¶ 33-35, 37, 50-51; Docket No. 31 at ¶ 26). Further it is uncontroverted that the restructuring resulted in a significant reduction of SG&A from $5,309,000.00 to $4,673,000.00. <u>Id.</u> ¶ 94. Similarly, it is also uncontroverted that total salaries and benefits paid by the Puerto Rico office reduced from $3,245,059.00 in 2013 to $2,415,077.00 in 2014. <u>Id.</u> ¶ 95. Thus, Defendants articulated a legitimate, non-discriminatory reason for terminating Plaintiff. "[T]he ADEA is not a vehicle for reviewing the propriety of business decisions." <u>Hidalgo v. Overseas-Condado Ins. Agencies, Inc.</u>, 929 F. Supp. 555, 561 (D.P.R. 1996), <u>aff'd,</u> 120 F.3d 328 (1st Cir. 1997) (quotation omitted).

Even if *arguendo*, Plaintiff had established the fourth prong, demonstrated that Defendants decision was not age neutral, and rebutted Defendants' legitimate basis for his termination, Plaintiff still failed to present evidence which a fact-finder could use to determine that Defendants actions were solely pretext for age discrimination. Plaintiff posits that the September 2013 RIF was unjustified. He avers that Defendants cannot justify Plaintiff's termination simply because "expenses were too high"

since Plaintiff explained that "the company was making substantial profit, despite of the 'unacceptable' high expenses and a 'significant' reduction in sales". (Docket No. 30 at 15). However, this fails to address the issue of pretext. Similarly, Plaintiff contends that Defendants actions were pretextual when considering that Defendants promoted Mr. Sanjenis and Mr. Teruel, with salary increases, and hired two new Managers in 2014 whose salaries amounted to over $100,000 dollars. Id. However, these business decisions by Defendants as part of their reorganization are non-discriminatory in nature. See Rodriguez-Cruz, 209 F. Supp. 3d at 443 ("Plaintiff draws on evidence of bonuses and other signs of economic prosperity, none of which address the issue of pretext. […] Even if STPR's business were rock-solid, reorganization remains a non-discriminatory basis for terminating employees.")

Plaintiff also attempts to show pretext by referencing Defendants' comments regarding efforts to "rejuvenate" the region. Plaintiff centers this first argument on the fact that Mr. Flefel, during the meeting wherein he was told he was being discharged, allegedly told him that he was being terminated because the Puerto Rico office's expenses were too high and that the office intended to rejuvenate the region. (Docket 30 at 9-10). Mr. Zampierollo contends that "Flefel's use of the word 'rejuvenating' to Plaintiff when informing him of the decision, could reasonable led [sic] a jury to conclude that the decision was based or motivated by

Plaintiff ageist animus." Id. at 9; Docket No. 20-1 at 36. However, Plaintiff admits in his Deposition that he does not remember Mr. Flefel specifically saying the word "rejuvenating." (Docket No. 20-1 at 38).[5] Defendants' Reply highlighted this. (Docket No. 39 at 2). Moreover, Mr. Flefel's "rejuvenating the management" comment, without more, is insufficient to show a discriminatory animus. See Rodriguez-Cruz, 209 F. Supp. 3d at 436-47 (holding that the Chairman of the Board's comment about "cleaning house" did not constitute pretext as "it was not explicitly related to an age in any way. [And] [e]ven if it impliedly related to age, an isolated comment like Lessack's does not show discriminatory intent."); Lehman v. Prudential Ins. Co. of Am., 74 F.3d 323, 329 (1st. Cir. 1996) ("[i]solated, ambiguous remarks are insufficient,

---

[5] The pertinent part of the Deposition transcript reads as follows:

> Q. I'm asking you about a specific conversation in connection with your termination. And, the question was whether, during the conversation with Mr. Enrique Flefel, you [Mr. Zampierollo] discussed anything else, aside from what you just testified?
>
> A. No, it was basically or emphatically "This is a reduction in cost, and we're rejuvenating the management.".
>
> Q. Now, did Mr. Enrique Flefel specifically say the word "rejuvenating" the workforce?
>
> A. **I don't remember.**
>
> Q. **You don't remember?**
>
> A. **The specific words.**
>
> Q. **You don't remember the specific words?**
>
> A. **No.**

Docket No. 20-1 at 38, l. 14-22.

by themselves, to prove discriminatory intent.") The case of
Irizarry v. Fortuña is also instructive in this regard. In
Irizarry, United States District Court for the Southern District
of New York determined that the fact that the defendant was known
as "the Terminator" in his previous job and that he regarded his
mission to be the "rejuvenation" and "reinvigoration" of the New
York City branch of the Economic Development Administration was
insufficient to infer a discriminatory animus. *See* Irizarry v.
Fortuna, 1997 WL 266981, at *2 (S.D.N.Y. 1997). The Eleventh
Circuit reached a similar conclusion in Barsorian v. Grossman Roth,
P.A. by holding that the comment "We are going to refresh the IT
department" did not suggest a discriminatory intent. This because
the "use of the word refresh does not in itself suggest an age-
based animus." Barsorian v. Grossman Roth, P.A., 572 F. App'x 864,
870 (11th Cir. 2014). Further, Plaintiff admitted in his
Deposition, and failed to properly controvert in his *Response*,
that he was speculating as to other motives for his termination,
apart from cost reduction. (Docket No. 20-1 at 36-37).[6]

---

[6] The pertinent part of the Deposition transcript reads as follows:

> Q. So, if I understand you correctly, the stated reason for your
> termination was reduction in costs?
>
> A. Reduction in costs and rejuvenation of the team, of the region.
> We needed change. We needed change of … I'm one of the old guards
> there. I was part of all what came from William Sekkel, from
> Guillermo Féria, from everyone else, and this is, if you want to
> call it … **I don't know. I'm speculating there.**

Id. at 36-37, l. 21-2.

Plaintiff also attempts to show that Defendants' actions were
merely pretext for age discrimination by stating that he was not
offered a different position at Trane, not even one entailing a
salary reduction, rather than being terminated. Plaintiff alleges
that this, in conjunction with the fact that he did not have
performance issues at Trane, "further demonstrates that
Defendants' motives were pre-determined to eliminate Plaintiff
from the Company." (Docket No. 31 at 11). However, Trane did <u>not</u>
have a policy requiring it to reassign an employee whose position
is terminated within the Company. (Docket No. 20 ¶ 98). Plaintiff
admitted as much in his *Response*. (Docket No. 31 at 1).
Furthermore, Plaintiff did not request to be considered for another
position or a lateral move within Trane. (Docket No. 20 at ¶ 118).
As Defendants argued in their MSJ, they do not have the duty to
transfer or relocate an employee to another position if that
employee is laid off. (Docket No. 19 at 15). The District of Puerto
Rico has reiterated this by stating that "[f]ailing to offer an
employee a job that they did not apply for **is not evidence of
discriminatory intent: 'employers face no ... obligation' to offer
'transfers or relocations' when conducting a reduction in force.**")
<u>Zabala-De Jesus v. Sanofi Aventis Puerto Rico, Inc.</u>, 2018 WL
3636978, at *9 (D.P.R. 2018) (quoting <u>Pages-Cahue</u>, 82 F.3d at
539); *see also*, <u>Webber</u>, 417 F.3d at 240 (quotation omitted) ("[T]he
ADEA does not mandate that employers establish an

interdepartmental transfer program during the course of a RIF; **an employer incurs no duty to transfer an employee to another position when it reduces its work force for economic reasons**.") Therefore, Defendants' decision to terminate rather than transfer Mr. Zampierollo does not allow for a reasonable inference of pretext — let alone age-based discrimination.

Viewed in the light most favorable to Plaintiff, the record does not reveal sufficient evidence for a reasonable fact-finder to conclude that Mr. Zampierollo satisfied the *prima facie* case for discrimination regarding his September 2013 termination. Plaintiff failed to raise a genuine issue of fact as to whether his termination was motivated by discrimination. As the First Circuit has explained time and time again: "**It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must 'elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination.'** Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991) (quotation omitted)).

Since Plaintiff failed to elucidate specific facts sufficient to show age-based discrimination, the Court **GRANTS** Defendant's *Motion for Summary Judgment* (Docket No. 19).

### B. Supplemental State Law Claims

i. <u>Law 100</u>

Plaintiff also filed claims under Puerto Rico Law 100, 29 P.R. Laws Ann. §§ 146 *et seq.* (age discrimination). (Docket No. 1 at 8-9). Law 100 is the Puerto Rico general employment anti-discrimination statute which prohibits age-related discrimination. The First Circuit has held that "on the merits, age discrimination claims asserted under the ADEA and under Law No. 100 are coterminous." <u>Reyes Caballero</u>, 2019 WL 6330812, at *13 (D.P.R. 2019) (quoting <u>Dávila v. Corp de P.R. Para La Difusión Pública</u>, 498 F.3d 9 at 18 (1st. Cir. 2007)). The only difference between ADEA and Law 100 is "with respect to how the burden-shifting framework operates." <u>Dávila v. Corp de P.R. Para La Difusión Pública</u>, 498 F.3d 9 at 18 (1st. Cir. 2007). This means that Law 100 "establishes a rebuttable presumption that the employer has discriminated illegally unless the employer can show that the discharge was justified." <u>Martinez</u>, 397 F. Supp. 3d at 221 (citing P.R. LAWS ANN. tit. 29, § 148). Therefore, if the employer justifies the discharge, then the presumption disappears. <u>Id.</u> In the case at bar, the Law 100 presumption was duly rebutted as Defendants provided "just cause" for Mr. Zampierollo's dismissal through the September 2013 reorganization. The end goal of the reorganization, a legitimate business decision, was to cut costs and reduce the

SG&A, which it managed to do after the RIF. (Docket No. 20 at ¶¶ 33-35, 37, 57 and 94-95).

Hence, Plaintiff's Law 100 claim fails for the same reason that his ADEA claim failed. Since Plaintiff provided insufficient evidence wherein a reasonable fact-finder could determine that there exist genuine factual issues regarding Plaintiff's age discrimination claims, the Court **GRANTS** Defendants' *Motion for Summary Judgment* regarding Plaintiff's Law 100 claim.

ii. Law 80

Plaintiff also filed claims grounded on Puerto Rico Law 80, 9 P.R. Laws Ann. §§ 185 *et seq.* (wrongful discharge). (Docket No. 1 at 9). Law 80 "requires employers to compensate at-will employees who are discharged without just cause." Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 98 (1st Cir. 2018) (quotation omitted). Just cause can include "(e) Technological or reorganization changes as well as changes of style […] [and] (f) Downsizing made necessary by a reduction in the foreseen or prevailing volume of production, sales, or profits at the time of the discharge or for the purpose of increasing the establishment's competitiveness or productivity." 9 P.R. Laws Ann. §§ 185b(e)-(f). Further, Article 3 of Law 80 states that if an employee is discharged for reasons such as the ones in subsection 185b(e)-(f) mentioned above, then an employer "must give preference to those employees within the same occupational classification who have greater company-wide

seniority, that is, seniority with the employer counted from the last time that the employee began to work for the employer in a continuous and uninterrupted manner." Id. at § 185c. This occurs to "avoid an unjust discharge finding even though the reason for the workforce reduction is otherwise considered just cause." Hoffman-Garcia, 2018 WL 671200, at *6.

Plaintiff avers that Defendants failed to prove that Plaintiff's termination was justified since the restructure was only a "mere pretext to terminate Plaintiff and that the time of Plaintiff's termination the Company was making profit and merely had a reduction in revenue." (Docket No. 30 at 20-21). However, Defendants provided evidence that restructuring was necessary for the solvency of Trane's Puerto Rico office. (Docket No. 20 at ¶¶ 33-35, 37, 57). Further, Plaintiff does not have a right to retain his employment simply because he was a more "senior" employee than his replacements.[7] Defendants posit in their *Reply*, "Plaintiff was the only employee in his occupational classification, reason for which Defendants had no obligation to accommodate him in another position." (Docket No. 39 at 23-24). In his *Opposition to SUMF*, Plaintiff had previously failed to properly contradict Fact No. 96 at Docket No. 20 ("Plaintiff was the only employee in his occupational classification."), thus the Court admitted the same

---

[7] Mr. Sanjenis worked at Trane since 1999, while Mr. Teruel since 2006. (Docket No. 20-22 at 8).

pursuant to Local Rule 56. *See* D.P.R. Civ. R. 56. Likewise, as
Plaintiff was not replaced by any subsequent employee, Defendants
did not have to follow Law 80's preferential treatment rules. The
District for Puerto Rico determined as such in <u>Hoffman-Garcia v.
Metrohealth, Inc.</u> by explaining that "given that no retention or
rehiring within Hoffman's occupational classification occurred,
**the Hospital did not have to follow Law 80's preferential
treatment rules in rehiring Martínez instead of Hoffman as Safety
Officer**." <u>Hoffman-Garcia</u>, 2018 WL 671200, at *12; *see also*, <u>Cahue
v. De Espana</u>, 1995 WL 510062, at *10 ("Iberia did not
violate Law No. 80 when it dismissed plaintiff López, since she
was discharged with just cause and the evidence does not show **that
she could have been transferred or reassigned to a different
position within the same occupational classification to the one
which she previously held.**") Since Defendants provided sufficient
evidence wherein a reasonable fact-finder could determine that
Plaintiff's termination occurred for just cause and that it did
not have to follow Law 80's preferential treatment rules, the Court
**GRANTS** Defendants' *Motion for Summary Judgment* regarding the Law
80 claim.

## V.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants'
*Motion for Summary Judgment* at Docket No. 19. Consequently, **all** of
Plaintiff's claims are **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 21st day of February 2020.

                              S/ RAÚL M. ARIAS-MARXUACH
                              United States District Judge